**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

BINA AHMAD,                              :

                  Plaintiff,        :   No. _____

                              :

      v.                                   :

                              :   **COMPLAINT**

THE WESTCHESTER BANK HOLDING             :
CORPORATION, JOHN M. TOLOMER, in his     :
individual and professional capacities, and ROBERT   :   **Jury Trial Demanded**
E. GEYER, in his individual and professional   :
capacities.                              :

                              :

               Defendants.      :
-------------------------------------------------------------------- X

Plaintiff Bina Ahmad ("Ms. Ahmad" or "Plaintiff"), by and through her counsel,

Thompson Wigdor LLP, as and for her Complaint in this action against The Westchester Bank

Holding Corporation (the "Bank" or "The Westchester Bank"), John M. Tolomer ("Tolomer")

and Robert Geyer ("Geyer") (together, "Defendants"), hereby states and alleges as follows:

## NATURE OF THE CLAIMS

1.      Following years of harassment, discrimination, abuse, and hostility directed at

Ms. Ahmad because of her South Asian race and Bangladeshi national origin by her employer,

The Westchester Bank, its President and Chief Executive Officer John M. Tolomer, and its

Senior Vice President and Chief Lending Officer Robert E. Geyer, Ms. Ahmad brings this action

seeking redress for Defendants' vile and unlawful conduct, which has resulted in substantial

damages to Ms. Ahmad.

2.      Specifically, Plaintiff asserts claims for discrimination and hostile work

environment against Defendants under 42 U.S.C. § 1981 ("Section 1981") and the New York

State Human Rights Law, New York Executive Law §§ 290 et seq. ("NYSHRL").

3.     Ms. Ahmad, the Bank's only upper management employee (Vice President or higher) who is of color, and its only employee of South Asian descent, has been one of the Bank's most successful and distinguished employees by any measure, but yet has been the victim of a degrading campaign of intolerance and racism emanating from all ranks of the Bank.

4.     As a result of this racism, Ms. Ahmad has been subjected to discriminatory terms and conditions of employment, and a hostile work environment merely because of the color of her skin and the country of her origin.

5.     To add insult to injury, and coinciding with the Bank's concerted effort to "turn up the heat" on Ms. Ahmad in order to rid her from the Bank, Ms. Ahmad was recently issued an utterly baseless and discriminatory "performance warning" by Defendant Tolomer, which itself was rife with lies, inconsistencies, and wholly pretextual criticisms of Ms. Ahmad.

6.     It is abundantly clear, however, that this "warning" was no more than an attempt to create a "paper trail" to give the Bank cover to continue to discriminate against and harass Ms. Ahmad.

7.     By filing this suit, Ms. Ahmad has chosen to take a stand against the vile discrimination occurring at The Westchester Bank, and seeks to put an end to the Bank's intolerably racist culture and employment practices.

## JURISDICTION AND VENUE

8.     The Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's civil rights under Section 1981.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c), as The Bank's principal place of business is located in the Southern District of New York.  Moreover, a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

10.     Within days of filing this Complaint, Ms. Ahmad will file a charge of discrimination and hostile work environment against The Westchester Bank with the Equal Employment Opportunity Commission ("EEOC").

11.     When the EEOC completes its investigation of Ms. Ahmad's charge and/or issues Ms. Ahmad a notice of right to sue, Ms. Ahmad will seek leave to amend this Complaint to add Title VII claims against The Bank.

## PARTIES

12.     Plaintiff Bina Ahmad is an adult woman born in Bangladesh, a nation that is located in South Asia, and currently resides in Westchester County, New York.  At all relevant times, Ms. Ahmad was an employee of The Westchester Bank under any and all relevant statutes

13.     Defendant The Westchester Bank is a New York corporation with a principal place of business located at 2001 Central Park Avenue, Yonkers, New York.   During the relevant time period, The Westchester Bank met the definition of "employer" under any and all relevant statutes.

14.     Defendant John Tolomer is and was, at all relevant times, the President and Chief Executive Officer of The Westchester Bank, and in this capacity, controlled Ms. Ahmad's terms and conditions of employment.  Upon information and belief, Mr. Tolomer is a resident of the state of New York.

15.     Defendant Robert Geyer is and was, at all relevant times, the Senior Vice President and Chief Lending Officer of The Westchester Bank, and in this capacity, controlled Ms. Ahmad's terms and conditions of employment.  Upon information and belief, Mr. Geyer is a resident of the state of New York.

## FACTUAL ALLEGATIONS

### I.   THE WESTCHESTER BANK'S TROUBLING LACK OF DIVERSITY IN ITS EMPLOYEE RANKS

16.     Ms. Ahmad is an adult South Asian woman who was born in Bangladesh.

17.     Ms. Ahmad was originally hired by The Westchester Bank in October, 2009, following a career in the banking industry that spanned more than two decades, to be a Vice President and the Branch Manager of the Bank's newly-opened White Plains location.

18.     During her tenure with The Westchester Bank, Ms. Ahmad, has been one of the Bank's most successful and distinguished employees.

19.     Through Ms. Ahmad's hard work, stellar reputation in the Westchester County banking community, and extensive customer contacts and relationships, the White Plains branch secured a remarkable $70 million in deposits within just two years of its launch.

20.     Shockingly, however, besides Ms. Ahmad, there is no other person of color in either The Westchester Bank's Board of Directors or its upper management team (Vice President-level and higher).

21.     Upon information and belief, there has never been a single non-White member of the Bank's upper management ranks in its history, other than Ms. Ahmad.

22.     Further, of the approximately thirty-five (35) employees the Bank currently employs, no more than four (4) of these employees are individuals of color.

4

23.     The almost total absence of persons of color from the Bank's senior management and employment ranks is not an accident, but rather the byproduct of a racist culture that permeates the Bank and tolerates and even promotes the treatment of both its employees and its customers of color as second-class citizens.

## II.   THE BANK'S DISCRIMINATORY DENIAL OF EQUAL TERMS OF EMPLOYMENT TO MS. AHMAD

24.     Ms. Ahmad has consistently been discriminatorily denied equal terms and conditions of employment because of her race and national origin as compared to her White colleagues and counterparts.

25.     For example, even though Ms. Ahmad is currently tasked with and has had tremendous success managing the Bank's largest branch located in Yonkers, New York, and although she purportedly has identical job duties and responsibilities as Robert Corrado who is branch manager of the Bank's smaller White Plains, New York branch, Mr. Corrado, who is White, inexplicably holds the title of Senior Vice President, while Ms. Ahmad merely holds a Vice President title.

26.     Indeed, when asked whether Ms. Ahmad could expect to also be given a Senior Vice President title as Mr. Corrado holds, Defendant Tolomer responded that there was "no way" Ms. Ahmad would ever become a Senior Vice President, indicating that Bank's intent to continue to discriminate against Ms. Ahmad by denying her the same management title as her White counterpart.

27.     Furthermore, unlike all other upper management employees at the Bank, all of whom are White, including Ms. Ahmad's two White branch manager counterparts, Ms. Ahmad has been explicitly denied the ability to work from either an office or a private and discreet location within her branch.

28.     Rather, Ms. Ahmad has consistently been assigned to sit in highly degrading locations at the branches she has been tasked with managing - locations which are more suitable for a receptionist or a greeter than a branch manager.

29.     Specifically, during the time Ms. Ahmad worked as the branch manager of the Bank's White Plains, New York location, she requested that she be allowed to sit in what was then an unoccupied office in the branch.

30.     However, the Bank, and specifically Defendant Tolomer, capriciously refused to allow her to move into this office, and instead, insisted that her workspace remain where it was - in a demeaning and entirely unenclosed location devoid of any privacy right by the branch's front entrance.

31.     In direct contrast, as soon as Robert Corrado became branch manager of the White Plains location, he spurned the humiliating desk Ms. Ahmad had been required to work from, and immediately occupied the empty office which Ms. Ahmad was explicitly and discriminatorily denied.

32.     Mr. Corrado still sits in this office to this day, and, upon information and belief, has not been reprimanded nor asked to sit elsewhere by Defendant Tolomer.

33.     Moreover, at the Bank's Yonkers location which Ms. Ahmad now manages, Ms. Ahmad is assigned to now once again sit and work from an entirely open and intrusive location right by the front entrance of the Yonkers branch in what used to be a customer waiting area, a humiliating and degrading location that is once again more akin to a seat occupied by a receptionist or greeter rather than a branch manager.

34.     To add further insult, Ms. Ahmad former office in the Yonkers branch, in which she temporarily sat immediately after being transferred to that branch in late-2011, was abruptly reassigned to a White non-managerial employee.

35.     Upon information and belief, each and every one of Ms. Ahmad's upper management contemporaries, (all of whom are White), have sat, and to this day still sit in either their own private office or in a far more discreet and enclosed space than Ms. Ahmad.

36.     By repeatedly denying Ms. Ahmad the same opportunity as her White peers to simply have her own office, or at least occupy a more dignified and appropriate workspace suitable for an employee of her position, the Bank has made it clear that it regards Ms. Ahmad as a "second class citizen" amongst its employee ranks.

37.     In addition, Ms. Ahmad has routinely been denied the support that has been available to the Bank's other White upper management employees, which has directly handicapped her ability to carry out her duties and responsibilities as a Vice President and Branch Manager.

38.     For example, besides Ms. Ahmad, all other upper management employees, who all happen to be White, were, from the outset of their employment with the Bank, given corporate credit cards to use as tools to further client development and network.

39.     However, for reasons unknown, the Bank failed to offer this privilege to Ms. Ahmad for years after she began working at the Bank, hindering Ms. Ahmad's ability to network and grow her branches in the process, and only provided her this opportunity after she made repeated requests.

40.     Further, unlike her White Branch Manager counterparts, Ms. Ahmad is routinely and unfairly scrutinized by Defendant Tolomer, Defendant Geyer and others for merely carrying out her job duties and responsibilities.

41.     For instance, the Bank purportedly gives branch managers like Ms. Ahmad discretion to waive certain service charges, such as overdraft fees, that may be assessed to a branch's clients, as a tool to preserve important client relationships that may be jeopardized were the Bank to rigidly assess fees against all its customers.

42.     However, unlike her White peers, Ms. Ahmad has constantly found herself having to defend and justify these purportedly "discretionary" decisions when she makes them, causing her to have to "look over her shoulder" each time she attempts to accommodate a customer, directly undermining her ability to perform her duties and responsibilities as branch manager.

43.     Even more appalling, Ms. Ahmad has been routinely criticized by the Bank for specifically accommodating clients of South Asian descent who are in danger of incurring service charges.

44.     In fact, Defendant Tolomer and other Bank officials have condemned Ms. Ahmad for working with the Bank's South Asian clients to reconcile potential service charge assessments - efforts which Mr. Tolomer has even insultingly deemed a "waste of time."

45.     In contrast, such reprimands are not given whenever attempts to accommodate the Bank's White clients are made, demonstrating the Bank's discriminatory policy of valuing the business of White clients higher than those of color.

46.     In addition, Ms. Ahmad, whose performance is evaluated in part based on her branch's ability to increase its deposit holdings each year, has been discriminatorily set up to fail and miss her performance goals because of arbitrary deposit redistribution policies the Bank has

recently instituted which have caused a disproportionate redistribution of deposit accounts held in the Yonkers branch, which Ms. Ahmad manages, to the Bank's other two branches, which happen to be managed by White branch managers.

47.     As a result of these policies, and the resulting uneven redistribution of deposit accounts in favor of Ms. Ahmad's White branch manager counterparts at Ms. Ahmad's expense, the Bank has once again displayed its discriminatory preference for its White employees over its employee of color such as Ms. Ahmad.

48.     Furthermore, upon information and belief, the Bank has also discriminated against Ms. Ahmad by compensating her less than her White Branch Manager peers throughout her employment.

### III.   MS. AHMAD HAS BEEN TARGETED BY DEFENDANTS AND OTHERS BECAUSE OF HER RACE, RESULTING IN HER HAVING TO ENDURE A BITTERLY HOSTILE WORK ENVIRONMENT, PERMEATED WITH RACIAL DISCRIMINATION AND HARASSMENT

49.     Ms. Ahmad has been subjected to a workplace riddled with discriminatory intimidation, ridicule, insult and harassment, which has altered the conditions of Ms. Ahmad's employment, and her ability to carry out her duties and responsibilities.

50.     Indeed, after Ms. Ahmad was abruptly transferred from the White Plains branch to the Bank's Yonkers branch in late-2011, Ms. Ahmad was and continues to be forced to endure, on a daily-basis, a severe and pervasive hostile work environment rife with intolerant comments and other harassing conduct directed at her because of her race and/or national origin.

51.     This discriminatory work environment is tolerated and even promoted by the Bank, and has caused Ms. Ahmad to suffer severe stress and anxiety.

52.     For instance, Defendant Geyer, who has direct control over Plaintiff's terms and conditions of employment, has, with impunity, singled-out, harassed and demeaned Ms. Ahmad by, among other things, regularly:

A.  Throwing paper spitballs at Ms. Ahmad while she sits at her desk;

B.  Deliberately slamming his office door in Ms. Ahmad's face as she attempts to engage him in his office;

C.  Entering Ms. Ahmad's former office unannounced and turning off the lights without warning, and then silently leaving the room;

D.  Sneaking up behind Ms. Ahmad as she is seated and suddenly, and without warning, pushing on a height-adjusting lever on her chair so that she plummets in her seat, before turning and walking away without saying a word;

E.  Silently approaching Ms. Ahmad and then suddenly reaching out and grabbing Ms. Ahmad's name-tag and flipping the name-tag over, before turning around and walking away in silence;

F.  Going out of his way to remain inside his office and refuse to participate in office events wherein Ms. Ahmad is recognized such as birthday gatherings, despite attending and actively participating in similar events for the Bank's White employees almost without fail;

G.  Inexplicably refusing to respond for days to e-mails sent by Ms. Ahmad requiring his immediate attention;

H.  Deliberately ignoring Ms. Ahmad during Bank outings and social events;

I.  Summarily dismissing loan applications submitted by Ms. Ahmad on behalf of customers - especially applicants of South Asian descent - which has the effect of sabotaging Ms. Ahmad's job since her performance is measured, in part, by the loan income her branch generates.

53.     Defendant Geyer has not subjected any other Bank employee besides Ms. Ahmad to such sustained, malicious, and unrelenting harassment and hostility.

54.     Besides Defendant Geyer, other high ranking Bank officials such as Kimberly Foster, the Bank's former Vice President and Director of Cash Management and Deposit Operations, and Patrick Brennan, the Bank's Vice President of Information Technology, have

also, on a regular basis, been openly hostile towards Ms. Ahmad because of Ms. Ahmad's race and/or national origin.

55.     For instance, Ms. Foster routinely utilize abusive language to disparage Ms. Ahmad in front of colleagues and customers - something which Ms. Foster never did to any White Bank manager or employee – and would routinely undermine and demean Ms. Ahmad, such as by throwing papers on Ms. Ahmad's desk and loudly barking orders at her to "do this - you are the manager!"

56.     Ms. Foster would also refuse to go on business calls with Ms. Ahmad, though she would regularly go on such calls with the other White Branch Managers.

57.     Ms. Foster would also mock Ms. Ahmad and make insulting comments concerning Ms. Ahmad's decision to not drink alcohol for religious and cultural reasons, and has even, on multiple occasions, attempted to spike Ms. Ahmad's drink with alcohol during work-related events.

58.     Moreover, Ms. Foster, after recently being instructed to shift all Bank employee and employee family bank accounts from the Yonkers branch to the other Bank branches, erroneously transferred many of the accounts held at the Yonkers branch of customers with Bangladeshi/South Asian-sounding names to the Bank's other branches

59.     When confronted with why she acted so recklessly, Ms. Foster, who had been previously provided with a list of specific account names belonging to Ms. Ahmad's family members, laughed, and absurdly and offensively stated that she "assumed" all of these accounts belonged to Ms. Ahmad's relatives, demonstrating Ms. Foster's racist attitude towards Ms. Ahmad and individuals of South Asian descent, whom she evidently viewed as being indistinguishable from one another.

60.     Likewise, Patrick Brennan, who is in charge of the Bank's IT Department, has also routinely and openly displayed his hostility towards Ms. Ahmad because of her race and/or national origin by, among other things, deliberately refusing to answer Ms. Ahmad's phone calls, which often regard crucial IT problems needing immediate attention, sabotaging Ms. Ahmad's ability to perform her job.

61.     In contrast, Mr. Brennan promptly responds to inquiries made by the Bank's White managers and employees.

62.     Mr. Brennan has also verbally harassed Ms. Ahmad through veiled, malicious comments directed at her race/national origin, such as telling her, among other things, that he "will cut [her] up into pieces and put her in a bag and ship [her] out to where [she] came from," that "no one cares about her opinion," that she is "laughed at" behind her back, and that she "should shut up" and "shut her mouth."

63.     Brennan has even personally attacked Ms. Ahmad's family and heritage, such as by saying that he "understands why "[her] husband does not want to come home to her," intimating that he is having an extra-marital affair, and that he can "see why [Ms. Ahmad's] son moved out of [her] home," a reference to Ms. Ahmad's South Asian heritage in which children, as a cultural norm, are expected to live with their parents well into their adulthood.

64.     Furthermore, Ms. Ahmad has also been regularly unwantedly subjected to offensive and discriminatory comments by Robert Corrado, Senior Vice President and Branch Manager of the White Plains branch.

65.     For instance, Mr. Corrado routinely makes highly offensive remarks to Ms. Ahmad about the Bank's South Asian clients, such as by derisively "joking" about these clients' English accents.

66. Indeed, Mr. Corrado has often commented on how he found the way in which these clients spoke English "amusing," and would "joke" to Ms. Ahmad about how it would be "entertaining" to observe these South Asian clients socialize and communicate with White Bank higher ups, implying that these South Asian individuals were somehow less sophisticated and cultured than the Bank's White officials.

67. Such insensitive comments have deeply offended Ms. Ahmad, who herself is a non-native English speaker who maintains an accent, and who has had to overcome this obstacle through hard work and perseverance to be where she is today.

68. The Bank's bias against persons of color even permeates the Bank's non-upper managerial employees.

69. For instance, it is commonplace for White Bank employees to ignore and/or simply refuse to provide service to customers of color who walk into the Bank.

70. When a White Bank employee does acknowledge customers of color, more often than not, the customer is told that that, "Bina will service you," and is then insultingly passed onto Ms. Ahmad, as if Ms. Ahmad, by virtue of being one of the Bank's lone employees of color, is solely responsible for servicing all of the Bank's non-White clientele.

## IV. DESPITE BEING AWARE OF THE HOSTILE AND HARASSING WORK ENVIRONMENT MS. AHMAD HAS HAD TO ENDURE, THE BANK HAS DONE NOTHING TO PREVENT THIS UNLAWFUL CONDUCT FROM CONTINUING

71. The Bank has been aware of the discrimination and hostile work environment Ms. Ahmad has had to endure, yet has taken no action to address this troubling situation.

72. For instance, while it is Ms. Ahmad's understanding that Patrick Brennan was spoken to about his harassing and discriminatory comments against Ms. Ahmad, he remains

employed by the Bank to this day, despite the Bank's purported "zero tolerance policy" for those who harass fellow employees.

73.     Moreover, both Defendant Tolomer and Kristen Ball, the Bank's "Human Resources Director," learned in August, 2012 that Mr. Geyer, Ms. Foster and others were harassing Ms. Ahmad, and causing Ms. Ahmad to suffer severe work-related stress.

74.     No action was taken to address this situation.

75.     In addition, Ms. Ball subsequently was reminded of Ms. Ahmad victimization in the workplace when Ms. Ahmad requested that she be enrolled in an online seminar addressing "How to Handle Workplace Bullying."

76.     Yet again, the Bank failed to address Ms. Ahmad's plight.

## V.     MS. AHMAD'S DISCRIMINATORY "PERFORMANCE WARNING"

77.     In what was an obvious attempt to manufacture a "paper trail" in order to give the Bank cover to continue to discriminate against and harass Ms. Ahmad, and potentially justify an unlawful racially-motivated termination, in mid-July, 2013, Ms. Ahmad was issued a written "performance warning" signed by Defendant Tolomer detailing numerous purported performance issues.

78.     However, it is abundantly clear that the "performance warning" - the first of its kind received by Ms. Ahmad throughout her 25-year career in the banking industry - is itself rife with additional examples of the Bank's discriminatory treatment of and bias towards Ms. Ahmad.

79.     For instance, the "performance warning" faults Ms. Ahmad for purportedly not informing Defendant Tolomer that a particular client was suspected of illicit activity months earlier, yet, White Bank management employees, such as Defendant Geyer and Kimberly Foster

14

who were equally aware of this suspected activity and likewise did not report the suspected activity to Defendants Tolomer, were not reprimanded in any way.

80.     Further, Ms. Ahmad was faulted for purportedly not making "40 calls a month" to potential customers, despite previous communications by Defendant Tolomer to Ms. Ahmad advising that she was only responsible for making 20 calls each month.  In fact, upon information and belief, Defendant Tolomer does not require the Bank's other White branch managers to make these monthly calls to customers, and/or routinely turns a blind eye when the Bank's other White branch managers fail to meet these "requirements."

81.     Moreover, the "performance warning" also falsely stated that Ms. Ahmad was not on pace to meet her performance goal of increasing her branch's deposits by $20 million because the Yonkers branch had purportedly only increased its deposit volume by $6 million thus far this year.  However, at the time the "warning" was issued, the Yonkers branch had actually increased its deposits by $15 million from the start of the year, and was well on pace to meet the $20 million goal, indicating, once again, that Defendant Tolomer was willing to resort to manufactured, pretextual bases to criticize Ms. Ahmad, and pave the way for a possible unlawful and racially motivated termination.

82.     Indeed, as of the date of this Complaint, the Yonkers branch has actually increased the amount of its deposits from the beginning of 2013 by more than $20 million, meaning that Ms. Ahmad has not only already met her performance targets, but is projected to exceed her target by several million dollars by years end.

83.     This impressive and substantial growth in deposits has occurred in spite of Defendant Tolomer's arbitrary and discriminatory decision to shift several key deposit accounts

from the Yonkers branch to the Bank's other two branches – a decision that has unjustly rewarded Ms. Ahmad's White branch manager counterparts at Ms. Ahmad's expense.

84. In addition, the "performance warning" stated that Ms. Ahmad "lack[s] understanding of basic banking principals [sic]" - a statement directly belied by the strong performance reviews Ms. Ahmad has received throughout her tenure at The Westchester Bank, including her consistent ratings of "very good" in the category of "job knowledge."

85. Accordingly, it is clear that this "Performance Warning" was little more than a transparent attempt to sully Ms. Ahmad's employment record in order to justify taking further adverse employment actions against her, and to hide the true root of the Bank's dissatisfaction with Ms. Ahmad – the Bank's discriminatory bias towards her race and national origin.

## VI.    THE BANK'S UNLAWFUL BANKING PRACTICES

86. Ms. Ahmad has also had to work within a discriminatory banking environment and culture wherein many of the Bank's South Asian clients and prospective clients have and continue to face considerable obstacles in the Bank's loan application process due to the unlawful bias harbored against them by the Bank's loan committee, including Defendant Geyer, the Bank's Chief Lending Officer, and his team of all-White lenders.

87. This racially motivated hostility towards the Bank's South Asian clientele stands in stark contrast to the manner in which Mr. Geyer and others at the Bank go out of their way to extend credit to White loan applicants.

88. Indeed, Ms. Ahmad has regularly observed Mr. Geyer summarily decline and/or ignore loan applications submitted to the Bank by individuals and businesses run by persons of color, particularly those of South Asian descent, and especially when such applications are

submitted through Ms. Ahmad, to the detriment of Ms. Ahmad's ability to meet her performance requirements and goals.

89.     Because of the racism harbored by the Bank's management, the Bank routinely dismisses loan applications submitted from members of this community under the thinnest of pretexts.

90.     Defendant Geyer has even said, in connection with a discriminatory and perfunctory denial of a loan application from one South Asian applicant, that he refused to entertain the application because he did not want to have to "chase him [the borrower] to Pakistan."

91.     Further, Defendant Geyer deliberately - and conveniently - ignores many loan applications submitted by individuals of South Asian descent, lest he entertain the application and potentially leave behind a paper trail, given that the Bank would otherwise be required to disclose reasons why a loan request is denied.

92.     These despicable and discriminatory lending practices directly align with the type of racist attitudes that permeate the Bank, which have fostered and provided cover for the unlawful and hostile treatment of Ms. Ahmad, and have caused Ms. Ahmad to suffer substantial economic and non-economic damages.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Discrimination and Hostile Work Environment in Violation of 42 U.S.C. § 1981 (Section 1981))

93.     Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

94.     Defendants have discriminated against Plaintiff on the basis of her race and/or national origin, in violation of Section 1981, by denying her the same terms and conditions

17

available to White employees, including, but not limited to, subjecting her to disparate working conditions, denying her the opportunity to work in an employment setting free of unlawful discrimination and harassment, and issuing her a baseless and unfair performance warning.

95.     Defendants have discriminated against Plaintiff on the basis of her race and/or national origin, in violation of Section 1981, by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Plaintiff based on her race and/or national origin.

96.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

97.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish, emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, insomnia, loss of appetite, and emotional pain and suffering, and physical injuries, including chest pain and left arm and shoulder numbness, for which she is entitled to an award of monetary damages and other relief.

98.     Defendants' unlawful discriminatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Discrimination and Hostile Work Environment in Violation of the New York State Human Rights Law)

99.    Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

100.    Defendants have discriminated against Plaintiff on the basis of her race and/or national origin, in violation of the NYSHRL, by denying her the same terms and conditions available to White employees, including, but not limited to, subjecting her to disparate working conditions, denying her the opportunity to work in an employment setting free of unlawful discrimination and harassment, and issuing her a baseless and unfair performance warning.

101.    Defendants have discriminated against Plaintiff on the basis of her race and/or national origin, in violation of the NYSHRL, by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Plaintiff based on her race and/or national origin.

102.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSRHL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

103.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish, emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, insomnia, loss of appetite, and emotional pain and suffering, and physical injuries, including chest pain and left

arm and shoulder numbness, for which she is entitled to an award of monetary damages and other relief.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Aiding and Abetting Violations of the New York State Human Rights Law Against Defendants John Tolomer and Robert Geyer)**

104.    Plaintiff hereby repeats, reiterates, and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

105.    Defendant Tolomer and Defendant Geyer knowingly or recklessly aided and abetted the unlawful employment practices against Plaintiff stated herein in violation of the NYSHRL.

106.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages for which she is entitled to an award of monetary damages.

107.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish, emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, insomnia, loss of appetite, and emotional pain and suffering, and physical injuries, including chest pain and left arm and shoulder numbness, for which she is entitled to an award of monetary damages and other relief.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A.    Declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of New York;

B.     An injunction and order permanently restraining Defendants and their agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices as set forth herein;

C.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D.     An award of damages in an amount to be determined at trial plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for her mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

E.     An award of damages in an amount to be determined at trial plus prejudgment, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

F.     An award of punitive damages in an amount to be determined at trial;

G.     An award of costs that Plaintiff has incurred in this action, including, but not limited, to expert witness fees, as well as reasonable attorneys' fees and costs to the fullest extent permitted by law; and

H.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: September 17, 2013
        New York, New York

                          **THOMPSON WIGDOR LLP**

                          By: _____
                               Douglas H. Wigdor
                               Tanvir H. Rahman

                          85 Fifth Avenue
                          New York, NY  10003
                          Telephone:     (212) 257-6800
                          Facsimile:     (212) 257-6845
                          dwigdor@thompsonwigdor.com
                          trahman@thompsonwigdor.com

                          *COUNSEL FOR PLAINTIFF*

22